Filed 11/8/13  Gabrielino-Tongva Tribe v. St. Monica Redevelopment CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| GABRIELINO-TONGVA TRIBE, | B238603 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC361307) |
| v. | |
| ST. MONICA DEVELOPMENT et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Zaven Sinanian, Judge.  Reversed.

Lara & Ibarra and Delia Ibarra for Plaintiff and Appellant.

Law Offices of Jonathan Stein and Jonathan A. Stein for Defendants and Respondents.

At some time in California's distant past, the indigenous Tongva people of the Los Angeles Basin were associated with the San Gabriel Mission and became known as "Gabrielinos." In 1994, the Gabrielino-Tongva people were recognized by the State of California as "the aboriginal tribe of the Los Angeles Basin . . . ."[1] Currently in California there are several associations of descendants of this historic Native American tribe.

This appeal concerns two different groups of people claiming the right to control one such association, the Gabrielino-Tongva Tribe (the "Tribe"). One of these two factions (appellant) initiated this lawsuit against defendants (respondents); the other tribal entity settled the claims against defendants. Defendants moved for summary judgment based on that settlement. The trial court determined there was no triable issue of material fact concerning the authority of the settling faction to act on behalf of the Tribe and entered judgment for defendants. We determine there remain triable issues of material fact preventing summary disposition of this matter. We therefore reverse the judgment and the order granting respondents' motion for summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2001, defendant Jonathan Stein was hired by the Tribe to help it become the first Native American tribe to open a casino in Los Angeles County. Stein was appointed Chief Executive Officer (CEO) of the Tribe, which utilized office space within Stein's Santa Monica law offices as its principal place of business.

Stein incorporated Santa Monica Development Company (SMDC). SMDC entered into a written agreement dated February 1, 2001, with the "Gabrielino-Tongva Tribal Nation, a tribal sovereign for the Gabrielino aboriginal tribe of Los Angeles

---

[1] They have not yet achieved federal recognition, although the Bureau of Indian Affairs maintains official rolls of documented Gabrielino Indians.

Basin," for the purpose of pursuing the Tribe's plans to own and operate a casino (the Development Agreement).

Although the Tribe had been in existence for some time, it did not officially elect its first Tribal Council (Council) or governing board until October 2005. Samuel Dunlap, Virginia Carmelo, Edgar Perez, Shirley Machado, Martin Alcala and Adam Loya were elected to the Council. The Council was empowered to make all significant decisions concerning the Tribe, including control and expenditure of tribal funds.

In 2006, SMDC procured an investor, Libra Securities LLC (Libra), for the Tribe's casino project. Libra and the Tribe executed a Development Funding Agreement intended to support the Tribe's effort to develop one or more Las Vegas-style casinos in Los Angeles County. In May 2006, Libra credited the Tribe with $2,150,000 in investment funds.

Disagreements between Stein and the Council arose during the summer of 2006. In a September 9, 2006 meeting, Stein made several demands of the Council,[2] which it refused. In response, Stein hand-delivered a letter resigning as the Tribe's CEO.

The Council accepted Stein's resignation, removed him as a signatory on its bank accounts and relocated its principal place of business from Stein's law offices to newly-leased office space. The Council asked former state senator Richard Polanco to replace Stein as CEO of the Tribe.

After his termination, Stein sent a letter, which he admitted was not authorized by the Council, to the entire Tribe membership announcing he had been fired and that his "assistant, Barbara Garcia, is the Tribal Administrator . . . [who] keeps membership records." He did not seek to return the membership records to the individual members or to the Council; rather, Stein asked the members to write to the Council to express support for him and his "Tribal Administration Office." Stein also deleted all of the Council members' telephone numbers from the Tribe's Web site, deactivated their e-

---

[2] The demands included firing the Tribe's general counsel, the designation of Stein as sole signatory on the Tribe's bank accounts and the removal of Dunlap from the Council.

3

mails and left his office number as the sole contact for the Tribe. Additionally, Stein communicated with Wells Fargo Bank and Union Bank in an effort to freeze the Tribe's assets.

The foregoing conduct led the Tribe to file a lawsuit against Stein and SMDC on November 2, 2006 for misrepresenting their authority in an attempt to control the Tribe's finances and assets, undermining the Tribe's efforts to seek federal recognition and to develop a casino, and defaming members of the Council. The same day the Tribe filed its complaint, Stein and SMDC sued the Tribe, each of the Council Members, the Tribe's general counsel, outside counsel and the newly appointment CEO and Libra—the sole investor in the Tribe's casino project. These two lawsuits, together with a third action filed by one of the Tribe's former federal lobbyists, were consolidated into one action.

Shortly after Stein's formal relationship with the Tribe was terminated and this litigation commenced, Stein contacted Tribe members who had previously but unsuccessfully run for positions on the Council inviting them to join a newly-created group entitled the "Financial Oversight Committee" (FOC). He asked the FOC members to support a recall of the Council members and suggested, if the recall were successful, the FOC members could become Council members and thereby gain control over all of the Tribe's activities including the casino project.

On November 18, 2006, Stein convened a group of the Tribe's membership and introduced them to the FOC. He told the members the Tribe owed him $2.7 million and the Council had embezzled money from Libra and then fired Stein when he tried to stop the embezzlement. Although Stein intended to call for a recall election at that meeting, he acknowledged in his deposition[3] no recall ever took place.

_____

[3] Respondents urge this court to disregard the Stein deposition, among other documents, because this evidence was not submitted with the papers as specified by Code of Civil Procedure section 437c, subdivision (c), but attached to related pleadings filed with the court. We decline to do so. The trial court noted that all parties' submission contained procedural violations, but indicated it would nonetheless consider the motions on the merits. Respondents themselves rely on the contents of the Stein declaration in their appellate brief.

4

After this litigation commenced, certain members of the Tribe sent Stein pre-printed "blue cards" demanding Stein return their tribal records.  The blue cards read in full:  "Dear Mr. Stein, I demand you return all my Member Records immediately!  You are no longer affiliated with the Tribal Council.  Forward my Member Records to. . . . ."  Thereafter the card provided space for the signatory's name, address and signature.  The blue cards were addressed to "Law Offices of Jonathan A. Stein," and included Stein's California State Bar number.  The Tribe members who submitted the blue cards received no immediate response from Stein.

On December 18, 2006, an entity named "Gabrielino-Tongva Tribe" was registered with the Secretary of State as an unincorporated association.  Linda Candelaria signed the form as a member of the FOC.  Barbara Garcia, Stein's legal assistant, was listed as the registered agent for service of process.

In the spring of 2007, some months after receiving the blue cards, Stein's legal assistant responded to the blue cards by mailing a "Return of Membership Records Form," on letterhead of the "Gabrielino-Tongva Tribe," which informed those who made the requests that they were no longer members of the Tribe.  Under the certification, "I have reviewed the membership records of the Gabrielino-Tongva Tribe, a California Indian Tribe historically known as San Gabriel Band of Mission Indians," the text read:  "I have enclosed the original membership records for the above-mentioned individual(s) held by the Gabrielino-Tongva Tribe.  I have returned the original membership records to you at the address listed in your contact information.  A copy of the membership termination letter [i.e., blue card] has been kept for our records."  At the bottom of the certificate, under the heading "Tribal Council," appeared the names Linda Candelaria, Bernie Acuna, Martha Gonzalez Lemos, Suzanne Rodriguez and Laurie Salse.  The designations "Chief Executive Officer:  Jonathan Stein, St. Monica Development Co., LLC" and "Tribal Administrator:  Barbara Garcia" also appeared at the foot of the letter.

Thus, as of late 2006 or early 2007, there were two councils claiming to speak for, and act on behalf of, the Gabrielino-Tongva Tribe.  To avoid confusion in discussing these two separate groups, we hereafter refer to the group represented by the Council

5

members elected in 2005 as the "Dunlap Faction" (appellant) and the group represented by the persons elected to the Council in 2007 as the "Candelaria Faction."

In March, 2007, Stein and the Candelaria Faction entered into an "Assumption and Estoppel Agreement," pursuant to which the Tribe agreed to be estopped from denying its obligation to pay $2,700,897.65 to Stein and SMDC under the terms of the Development Agreement.

In July 2007, the Dunlap Faction filed the Tribe's second amended complaint (SAC), the operative pleading before us. This complaint stated claims for conversion, breach of fiduciary duty, misappropriation of trade secrets, breach of confidence, intentional interference with economic relationships, negligent interference with economic relationships, breach of contract, breach of the implied covenant of good faith and fair dealing, legal malpractice, violation of Penal Code section 502, subdivision (c) and unfair competition. The Tribe sought injunctive and declaratory relief, as well as unspecified damages.

On October 30, 2007, Stein and SMDC entered into a Settlement and Release Agreement with the Candelaria Faction (the "Settlement Agreement"), pursuant to which the Tribe agreed to settle its claims against Stein and SMDC for $1,000. Candelaria signed the agreement on behalf of the "Gabrielino-Tongva Tribe" and represented she and the tribal entity had the authority to settle the claims.

The Dunlap Faction learned about the foregoing settlement when Stein and SMDC moved for entry of judgment pursuant to the Settlement Agreement, as provided in Code of Civil Procedure section 664.6. In April 2008, the trial court granted the motion as it pertained to the Candelaria Faction but found the Dunlap Faction had not settled its claims concerning the Development Agreement and refused to dismiss the Dunlap Faction's complaint against Stein and SMDC. The court stated, "While this ruling clarifies the positions of the SMDC/Tribe parties, it does not eliminate the on-going claims and cross-claims of the [Dunlap Faction] and SMDC."

After further proceedings not directly relevant here, Stein and SMDC each moved for summary judgment on the operative complaint, arguing they had settled all of their

6

claims with the "Gabrielino-Tongva Tribe," judgment had been entered by the trial court, and all claims being pursued by the Dunlap Faction should therefore be dismissed. They claimed the Dunlap Faction was a breakaway group called "GT Nation," which "only came into existence **after** Stein was terminated as an officer of the . . . Tribe . . . ." They further maintained the spin-off occurred when the breakaway members sent in "blue cards" as a "method of requesting that their . . . Tribe records be transferred to . . . [the] Nation."

The Dunlap Faction opposed the motions. In declarations of its CEO and a Council member, the Dunlap Faction denied it broke away from the Tribe and attested that it was the tribal entity which contracted with SMDC, hired and fired Stein, filed the instant lawsuit and had sole authority to prosecute and/or settle the lawsuit. The Dunlap Faction submitted additional evidence contradicting Stein and SMDC's evidence that its members had terminated their membership in the Tribe and joined a newly formed group and that the Council members elected in 2005 had abandoned their positions with the Tribe.

The trial court granted the summary judgment motions of Stein and SMDC. The court referred to "a Tribal Council Resolution dated 10/30/07 on GT Tribe letterhead, plainly providing that 'the Tribal Council finds that it is in the best interests of the Tribe that the legal action filed as . . . Los Angeles Superior Court Case No. BC-361307 . . . be settled and dismissed. . . .'" The court noted that in opposition, "GT Tribe claims that the settlement 'does not relate to the tribal organization that is a party to this lawsuit,'" and referred to the Dunlap Faction's evidence that Stein had acknowledged in his deposition the members of the Council of the Dunlap Faction had never been removed from office, nor abdicated, abandoned, or resigned their positions, or that the tribal entity which they governed had ceased to exist. The court concluded the Dunlap Faction "failed to submit any evidence to raise a triable issue of fact as to why the settlement agreement, which plainly calls for dismissal of GT Tribe's action against SMDC and Stein, is not determinative here." The court entered judgment for respondents; this timely appeal followed.

7

## II.  DISCUSSION

"On appeal from a summary judgment, our task is to independently determine whether an issue of material fact exists and whether the moving party is entitled to summary judgment as a matter of law.  [Citation.]  'We independently review the parties' papers supporting and opposing the motion, using the same method of analysis as the trial court.  Essentially, we assume the role of the trial court and apply the same rules and standards.'  [Citation.]  We apply the same three-step analysis required of the trial court.  First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond.  Second, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in the moving party's favor.  When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable issue of material fact.  [Citations.]  In so doing, we liberally construe the opposing party's evidence, strictly construe the moving party's evidence, and resolve all doubts in favor of the opposing party.  [Citations.]" (*Hutton v. Fidelity National Title Company* (2013) 213 Cal.App.4th 486, 493-494.)

Here, Stein and SMDC contended they were entitled to judgment as a matter of law because the tribal entity which sued them entered into a written agreement settling all its claims against them.  In support of this contention, respondents submitted the Settlement Agreement executed by Candelaria on behalf of the Tribe, together with the Council resolution which approved the settlement and release of claims.  They argued that as a result of the settlement, there were no pending causes of action for appellant to prosecute.

While the Dunlap Faction did not dispute that the Candelaria Faction executed a settlement agreement purporting to settle the SAC on behalf of the "Gabrielino-Tongva Tribe," it disputed the authority of Candelaria and the Candelaria Faction to act on behalf of the plaintiff in the SAC:  "Any such settlement does not relate to the tribal organization that is a party to this lawsuit."  To support its position, appellant submitted

8

the declaration of Sam Dunlap, Chairman of the Dunlap Faction's Council, who attested to the duly elected and acting members of the governing body of the Tribe—Candelaria was not among them. Appellant also referred to Stein's deposition in which he acknowledged the Dunlap Faction's Council members never submitted their resignations, nor were recalled from office. This contradicted respondents' position that the Dunlap Faction had ceased to serve as the Tribe's governing board, a necessary prerequisite to the lawful election of the Candelaria Faction; the supposed successor to the Dunlap Faction.

The record on appeal contains evidence to support the parties' respective positions regarding the authority of the Candelaria Faction to act on behalf of the plaintiff in this lawsuit. That evidence is rife with disputed issues of material fact. Because the evidence concerning the Candelaria Faction's authority to settle the claims brought against Stein and SMDC was disputed, respondents did not meet their burden on their motions for summary judgment.[4]

---

[4] Respondent's fallback argument is, even if the trial court erroneously granted summary judgment, the appeal should be dismissed because appellant's appeal should be from the 2008 order granting the motion made pursuant to Code of Civil Procedure section 664.6 and the time to pursue such an appeal has long expired. However, respondents acknowledge the order made pursuant to section 664.6 did not dismiss the SAC. Indeed, the trial court found the Dunlap Faction had not settled its claims and expressly stated that its finding "did not eliminate [those] on-going claims . . . ." Appellant had no reason to appeal an order or judgment that was not entered against it. (Code Civ. Proc, § 902 [allowing appeal only for an "aggrieved" party].) Appellant's appeal is timely in that it is properly from the order granting an opposing party's motion for summary judgment.

9

### III. DISPOSITION

The judgment and the order granting respondents' motion for summary judgment are reversed. Appellant is to recover its costs on appeal from respondents.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KUMAR, J.[*]

We concur:

TURNER, P. J.

MOSK, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.